.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:08-CV-90

MARKET CHOICE, INC.                    )
                        Plaintiff,          )
                                            )
       v.                    )          **ORDER**
                                            )
NEW ENGLAND COFFEE COMPANY,            )
AND RITEWAY SALES AND                  )
MARKETING,                             )
                       Defendants.          )
_____)

     **THIS MATTER** is before the court on Defendant New England Coffee Company's Amended Motion to Dismiss and Memorandum in Support (Documents # 62, 63), filed April 20, 2009, Plaintiff Market Choice, Inc.'s Response to Defendant's Amended Motion to Dismiss (Document # 69), filed May 6, 2009, and Defendant's Reply (Document #70), filed May 18, 2009. This matter is now ripe for disposition.

## I.     FACTUAL AND PROCEDURAL HISTORY

     The facts, taken in the light most favorable to the Plaintiff, tend to show the following: Plaintiff, Market Choice, Inc. (Market Choice), is a North Carolina corporation with its principal place of business in Mooresville, North Carolina. (Am. Compl. ¶ 1.) Market Choice operates as a master broker, as well as a sales and marketing agency in the retail food industry. (*Id.*) Defendant, New England Coffee Company (NEC) is a Massachusetts corporation with its principal place of

business in Malden, Massachusetts. (*Id.* at ¶ 2.) NEC manufactures and supplies various coffee and related products. (*Id.*) Prior to 2003, NEC was primarily a supplier of coffee products to the foodservice industry, including customers like Dunkin Donuts. (*Id.* at ¶¶ 6, 15.)

In July 2003, Market Choice and NEC, entered into a "Master Broker Agreement" making Market Choice the "sole, exclusive" sales broker for distribution of NEC's coffee line to approximately twenty-one grocery retailers. (*Id.* at ¶ 8; Am. Compl. Ex. A at 7-8.) In May 2003, prior to entering into the contract, Charles Moore, the founder of Market Choice, met NEC representatives at a food industry convention. (Am. Compl. ¶¶ 7, 15.) At that time, NEC indicated that other brokers were requesting a significant retainer as part of any contract to represent NEC. (*Id.* at ¶ 15.) Market Choice offered to promote NEC without any retainer, and instead, the proposed contract would require a one-time payment of one year's commissions in the event NEC terminated the contract. (*Id.*) The two parties executed a written contract in September 2003 (the Contract). (*Id.* at ¶ 19.)

In addition to the "payout commission," the Contract provided that Market Choice would receive an 8-percent commission on gross sales to the represented retailers. (*Id.* at ¶ 22; Am. Compl. Ex. A. at 2.) Also, the Contract anticipated that Market Choice would negotiate with other independent brokers (Sub-Brokers) to help service the Contract and would compensate the Sub-Brokers from its 8-percent commission. (Am. Compl. ¶¶ 27-28.) In 2003, Market Choice contracted with two Sub-Brokers to service the Contract, and in the case of one of those Sub-Brokers, Barry Mullinax, the contract included several brands in addition to NEC. (*Id.* at ¶¶ 39-40.) Subsequently, in or around October 2005, NEC hired Barry Mullinax to serve as its National Sales Manager, while he was still under contract with Market Choice. (*Id.* at ¶ 41.) In 2006, Market Choice expanded its

Sub-Broker contracts, in part due to NEC's urging, to include three additional Sub-Brokers. (*Id.* at ¶¶ 42-45.) During the term of the Contract, sales of NEC's products to the covered retailers increased from zero in July 2003 to approximately $11.1 million in 2006, with additional forecasted growth up to $17 million in 2007. (*Id.* at ¶ 38.)

At several unspecified times during the course of the Contract, Market Choice notified NEC that it might be violating federal anti-trust laws, specifically the Robinson-Patman Act, with certain business practices. (*Id.* at ¶ 47.) In early 2006, NEC began expressing its intention to eventually manage internally the accounts assigned to Market Choice. (*Id.* at ¶ 48.) In an email dated January 29, 2006, Bob Milliken, Vice President of Sales at NEC, stated, "We believe strongly that we have to manage our business in-house." (*Id.*; Am. Compl. Ex. C.) On or about March 26, 2007, NEC gave written notice to Market Choice that it did not intend to renew the Contract when it expired on June 30, 2007, (Am. Compl. ¶ 49), and asserted that it was terminating the Contract due to Market Choice's poor performance, (*Id.* at ¶ 50). Because NEC based the termination on poor performance, it refused to pay the "one-year payout commission" provided for in the Contract. (*Id.* at ¶ 51.) Before the Contract ended on June 30, 2007, NEC began contacting the Sub-Brokers in an effort to retain their services after the Contract ended. (*Id.* at ¶ 50.) Additionally, Bob Milliken contacted the representative of at least one retailer, Kroger, to inform him of Market Choice's termination before the contract ended. (*Id.* at ¶ 81.)

Market Choice filed its initial complaint with this Court on August 8, 2008 against several defendants, including New England Coffee Company (NEC). On November 3, 2008, Market Choice voluntarily dismissed claims against all of the defendants, except NEC and James Hall and Michael Rowan, d/b/a Riteway Sales and Marketing. Subsequently, on July 29, 2009, by consent of the

parties, Riteway Sales and Marketing was substituted for the individual defendants, Hall and Rowan. NEC filed its first Motion to Dismiss on January 23, 2009. On March 20, 2009, Market Choice filed its Amended Complaint against the remaining defendants. NEC filed its Amended Motion to Dismiss on April 20, 2009.

## II.    DISCUSSION OF CLAIMS

NEC moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that Market Choice fails to state a claim upon which relief can be granted with respect to the following claims: (i) violations of the Sales Representative Commissions Act, N.C. Gen. Stat. §66-190 *et seq.*; (ii) defamation; (iii) tortious interference with contract and business relationships; (iv) conversion; (v) unjust enrichment; (vi) an accounting; and (vii) unfair or deceptive trade practices, N.C. Gen. Stat. §75-1.1. NEC argues that all of these claims are insufficiently pled, and alternatively, that the tort and unfair or deceptive trade practices claims are barred by the economic loss doctrine. The contract between the parties provides that "the laws of the State of North Carolina shall govern the application, interpretation and enforcement of this Agreement." (Am. Compl. Ex. A at 1, ¶ 4.)

### A.    Standard for Motion to Dismiss

On a motion to dismiss pursuant to Rule 12(b)(6), this Court must "take the facts in the light most favorable to the plaintiff," but "need not accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). Although "heightened fact pleading of specifics" is not

required for a complaint to survive a motion to dismiss under Rule 12(b)(6), the allegations must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering the plausibility of a claim, the court must "draw on its judicial experience and common sense" to determine whether the well-pleaded facts of the complaint "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, --- S.C. ---, 129 S.Ct. 1937, 1950 (2009). The court must disregard conclusory statements unsupported by factual allegations, but "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

### B. N.C. Sales Representative Commissions Act

The Sales Representative Commissions Act provides a statutory remedy for unpaid commissions previously owed or that become due to a sales representative after termination of a contract "for any reason other than malfeasance of the sale representative." N.C. Gen. Stat. § 66-191. The statute defines "commission" as "compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders, sales or profits or as a specified amount per order or per sale." N.C. Gen. Stat. § 66-190(a). Market Choice alleges that NEC failed to pay both commissions owed for previous sales and a termination payment (or "one year pay-out commission"). (Am. Compl. ¶¶ 65, 69, 74, 120, 122.) The Contract provides for (1) "a commission or brokerage of **8%** on each and every sale of the products" (Am. Compl. Ex. A at 2, ¶ 10) and (2) "a one year pay-out commission" in the event NEC fails to renew the contract "for any reason except substantiated documented poor performance issues by [Market Choice], including but not limited to decision to take (sic) sales in-house, etc." (Am. Compl. Ex. A at 3, ¶ 16).

When viewed in the light most favorable to the plaintiff, Market Choice alleges a plausible claim for commissions due under paragraph 10 of the Contract that accrued before termination of the Contract. (*See* Am. Compl. ¶¶ 69, 74, 120, 122). Although the specific allegations under the statutory claim focus on the "pay-out commission," Market Choice later alleges under its accounting claim that "NEC withheld information concerning sales made to Wal-Mart prior to Market Choice's contract expiration." (*Id.* at ¶ 122.) The Amended Complaint also alleges that Market Choice sent NEC a written demand for payment of "pay-out commission due," (*Id.* at ¶ 71), and that "[p]laintiff's written demand for commissions due was in accordance with N.C.G.S. § 66-190 – 93," (*Id.* at ¶ 73). Both of these allegations support the reasonable inference that the written demand addressed any commissions due on termination of the contract. On these allegations, Market Choice is entitled an opportunity to discovery and to produce evidence of such unpaid commissions and proper notice as required by the statute.

However, Market Choice failed to state a claim respecting the "one year pay-out commission." Both parties agree that this claim hinges on the definition of "commission" under the statute. Under North Carolina rules of statutory construction, "[w]ords and phrases of a statute may not be interpreted out of context, but individual expressions must be construed as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." *In re Hardy*, 294 N.C. 90, 95-96, 240 S.E.2d 367, 371-72 (1978); *see also State v. Hollars*, 176 N.C. App. 571, 574, 626 S.E.2d 850, 853 (2006). Market Choice argues that the statute applies because the contract uses the term "commission" and the amount to be paid will be calculated as a percent of sales. NEC argues that the payment is based

on sales made by another broker during the year following termination of the contract and thus, does not constitute compensation for actual services rendered.

Regardless of whether the termination payment relates to the last year of the contract or to the subsequent year, it is presented in the Amended Complaint as compensation for Market Choice's risk and "pioneering" efforts in establishing a sales network. (Am. Compl. ¶¶ 15, 65, 68.) Thus, the payment is not compensation relating to a particular sales transaction. Instead, the "payout commission" constitutes a one-time payment, in lieu of an up-front retainer, for the risk and investment involved in developing the distribution network called for by the Contract. The statutory definition of "commission" is limited to "compensation accruing to a sales representative…the rate of which is expressed as a percentage of the amount of orders, sales, or profits or as a specified amount per order or per sale." N.C. Gen. Stat. §66-190(a). The statutory definition, taken as a whole, limits a "commission" to payments relating to a particular sales transaction or series of transactions attributable to the sales representative.  Although labeled "commission" in the Contract and calculated as a percent of sales, the termination payment does not fall within this statutory definition of a "commission." Market Choice specifically alleges that the purpose of the "pay-out commission" was to compensate Market Choice for the initial risk and investment of developing a distribution network for NEC, in lieu of an up-front retainer. (Am. Compl. ¶¶ 15, 65, 68.)  The statute does not extend to all contractually required payments to sale representatives, but instead, is limited to those payments that constitute a true sales commission.

## C.     Defamation

For a defamation claim to survive a motion to dismiss, a plaintiff must allege "[1] the defendant made false, defamatory statements of or concerning the plaintiff, [2] which were published to a third person, [3] causing injury to the plaintiff's reputation." *Griffin v. Holden*, 180 N.C. App. 129, 133, 636 S.E.2d 298, 302 (2006) (internal citations and punctuation omitted). Defamation is divided into "the two distinct torts of libel and slander." *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29-30, 568 S.E.2d 893, 898 (2002). Libel involves any false, written publication, while slander involves a false oral communication. *Id.* Defamatory statements are also generally divided into three classes: (1) *per se* defamation, including only obviously defamatory publications, (2) publications susceptible of two interpretations, one of which is defamatory and the other not, and (3) *per quod* defamation, including any publication which is "not obviously defamatory, but when considered with innuendo, colloquium, and explanatory circumstances" becomes defamatory. *Griffin*, 180 N.C. App. at 133-34, 636 S.E.2d at 302 (internal citations and punctuation omitted). The categorization of defamation claims "has a significant bearing on plaintiff's evidentiary burden" because a *prima facie* claim of *per se* defamation carries a "presumption of malice and a conclusive presumption of legal injury…entitling the victim to recover at least nominal damages without proof of special damages." *Id* at 134, 636 S.E.2d at 303. However, a claim of *per quod* defamation requires that the "injurious character of the words and some special damage must be pleaded and proved." *Id.*

"False words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable, and words so uttered may be actionable *per se*." *Boyce & Isley*, 153 N.C. App. at 30, 568 S.E.2d at 898 (*quoting*

*Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955)). To constitute defamation *per se*, the publication relating to a person's business reputation must "tend to impeach a person in that person's trade or profession." *Id.* at 29, 568 S.E.2d at 898. A corporation may sue for damages for slander or libel based on publications which have the "immediate tendency… to impair [the corporation's] reputation in its business relationships." *R.H. Bouligny, Inc. v. United Steelworkers of America, AFL-CIO*, 270 N.C. 160, 169, 154 S.E.2d 344, 353 (1967). NEC argues that the alleged defamatory statements all refer to Charles Moore and not to Market Choice directly. However, the nature of the business involved and the strong interrelationship between the reputations of Market Choice and Charles Moore are such that statements which impugn the reputation of Mr. Moore in his business relationships have the immediate tendency to also impair the reputation of Market Choice.

NEC further argues that the complaint fails to specifically state the alleged defamatory statements, identify the individuals who made the defamatory publications and the individuals to whom the publications were made, or state the time and place of the alleged publications. "The alleged defamatory statement or statements made or published by the defendant need not be set out verbatim in plaintiff's defamation complaint if alleged 'substantially *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory.'" *Andrews v. Elliot*, 109 N.C. App. 271, 274, 426 S.E.2d 430, 432 (1993) (*quoting Stutts v. Duke Power Co.*, 47 N.C. App. 76, 83-84, 266 S.E.2d 861, 866 (1980)). Additionally, neither the Federal Rules of Civil Procedure nor the Fourth Circuit impose a special or heightened pleading standard for defamation. *See Wuchenich v. Shenandoah Mem'l Hosp.*, 215 F.3d 1324, 2000 WL 665633, *14 (4th Cir. 2000); *Elina Adoption Services, Inc. v. Carolina Adoptions Services, Inc.*, 2008 WL 40005738, *13

(M.D.N.C. 2008). Instead, the proper standard for assessing the legal sufficiency of a claim for defamation focuses on the requirements of Rule 8(a). *Wuchenich*, 2000 WL 665633, at *14; *Elina Adoption Services*, 2008 WL 40005738, at *14. Under this standard, the complaint must allege enough facts to demonstrate that the claim is plausible on its face. *Twombly*, 550 U.S. at 570; *see also, Id.* at 562 ("[i]n practice, a complaint…must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (*quoting Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1155 (9th Cir. 1989))); *see also*, *Id.* at 564 n.10 (noting the importance of "specific time, place or person involved" in providing sufficient notice for the defendant to respond).

The Amended Complaint alleges two defamatory communications with sufficient specificity to demonstrate a plausible claim for defamation. First, the Amended Complaint alleges that Bob Milliken, an employee of NEC, made statements during a dinner "at a TGIF restaurant in the metropolitan New York City area" on January 30, 2007, to Ken Atchison, a sub-broker of Market Choice, and Ashtyn Tyler, a prospective sub-broker, including the remark "you don't know him yet," in reference to Charles Moore. (Am. Compl. ¶ 78.) This allegation fails to rise to the level of slander *per se*, because it only becomes defamatory when considered with "innuendo, colloquium, and explanatory circumstances." *Griffin*, 180 N.C. App. at 133-34, 636 S.E.2d at 302. Given the present context, a dinner conversation with a current sub-broker and potential sub-broker about the possibility of doing business with NEC rather than Market Choice and Charles Moore, the statement "you don't know him yet" may constitute slander *per quod*. Second, the Amended Complaint alleges that "in an email dated March 13, 2007 from Defendant NEC's Bob Milliken to Kroger's Craig Marshall, Defendant NEC made statements defaming Market Choice's owner Charles Moore by

writing false statements concerning his character and business capacity." (Am. Compl. ¶ 81.) Although this allegation fails to note the specific statements made, it does state that NEC "falsely represented that Market Choice was no longer authorized to call on Kroger despite the existence of a valid Contract." (*Id.*) This allegation also does not rise to the level of libel *per se*, but when considered in context with other alleged statements regarding the "character and business capacity" of Charles Moore (*id.*), it may constitute libel *per quod*. [1] Thus, both allegations provide sufficient notice of the particular defamatory publication to satisfy the notice requirements of Rule 8(a) and *Twombly*.

In order to survive Rule 12(b)(6), allegations of libel or slander *per quod* must allege the "injurious character of the words and some special damage." *Griffin*, 180 N.C. App. at 134, 636 S.E.2d at 303. The Amended Complaint satisfies this requirement by alleging that the publications "diminished [Market Choice's] ability to retain and generate new clients." (Am. Compl. ¶ 83.) *See Johnson v. Bollinger*, 86 N.C. App. 1, 12, 356 S.E.2d 378, 385 (1987) (holding that dismissal of a defamation under Rule 12(b)(6) for failure to plead special damages is only proper where "plaintiff omitted *any* allegation of damage to his trade or business"). Thus, Market Choice has sufficiently alleged a claim for defamation *per quod*.

### D.    Tortious Interference with Contract and Business Relationships

The requisite elements to allege a claim for tortious interference with contract are:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the

---

[1] Although the allegations in the Amended Complaint fail to support a claim for slander or libel *per se*, such claims may be supported through further discovery.

contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Embree Constr. Group, Inc. v. RAFCOR, INC.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992). "Whether an actor's conduct is justified depends 'upon the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party." *Id.* (*quoting Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988)). "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Id.*; *see also Peoples Sec.*, 322 N.C. at 222, 367 S.E.2d at 650 (acknowledging "the general principle that interference may be justified when the plaintiff and the defendant are competitors"). Thus, "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Sec.*, at 221, 367 S.E.2d at 650. "A motion under Rule 12(b)(6) should be granted when the complaint reveals that the interference was justified or privileged." *Id.* at 220, 367 S.E.2d at 650.

NEC argues that Market Choice fails to allege facts showing that NEC "acted without justification." Instead, NEC asserts that it had a legitimate business interest as a competitor in contracting directly with the Sub-Brokers. Although the Amended Complaint reveals a legitimate business interest of NEC in minimizing the amount of brokerage commission paid for distribution of its products, (Am. Compl. ¶ 48), Market Choice argues NEC primarily sought to "continue the policy of covering up discriminatory selling prices in violation of the Robinson-Patman Act." (Am.

Compl. ¶ 51.) To state a claim for relief, the complaint "must show that the defendant acted with malice and for a reason not reasonably related to the protection of a legitimate business interest." *Sellers v. Morton*, 661 S.E.2d 915, 921 (N.C. App. Ct. 2008) (*citing Market Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 158, 520 S.E.2d 570, 581 (1999)). Furthermore, "actual malice and freedom from liability for this tort may coexist." *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954). Thus, "[i]f the outsider has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be." *Id.*; *see also Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001) ("[T]he complaint must admit of no motive for interference other than malice."). Here, the Amended Complaint reveals NEC's legitimate business interest in reducing the costs of its broker relationships by eliminating Market Choice as a middle-man. Therefore, the Amended Complaint fails to allege that NEC acted without justification in contacting the Sub-Brokers and inducing them to contract directly with NEC.

Next, Market Choice alleges that it has "in essence lost the Sub-Brokers' services for representation of its other current and future manufacturers' product lines" and references product lines represented by Barry Mullinax. (Am. Compl. ¶ 94.) However, Market Choice does not allege tortious interference by NEC with its contract with Mullinax, but instead, focuses on actions of NEC "since the retention of Barry Mullinax" at NEC. (Am. Compl. ¶ 92.) Besides this generalized allegation regarding lost services, the Amended Complaint lacks any factual allegation that NEC's actions induced the Sub-Brokers not to perform on current contractual obligations with respect to any other product lines represented by Market Choice. Instead, the only other Sub-Broker contract provided in the Amended Complaint is specifically limited to representation of NEC, (Am. Compl.

Ex. B at 5), and no mention is made of other product lines included in the contracts of the other Sub-Brokers. (Am. Compl. ¶ 40, 43 – 45.) Thus, the Amended Complaint does not support a reasonable inference that any Sub-Brokers other than Mullinax provided services for products other than NEC. Furthermore, even if the Court accepts the inference that other Sub-Broker contracts did extend to products other than NEC, the Amended Complaint provides no factual allegation showing that the Sub-Brokers actually breached those agreements.

Market Choice also frames its allegations as a claim for tortious interference with its "business relationships," (Am. Compl. ¶ 87), which it argues is sufficient to raise a claim for tortious interference with prospective economic advantage, (Pl.'s Br. at 14). To maintain an action for tortious interference with prospective advantage, a plaintiff must allege: (1) the defendant induced a third party to refrain from entering into a contract with the plaintiff, (2) without justification, and (3) the contract would have ensued but for the defendants' interference. *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (*citing Cameron v. New Hanover Mem'l Hosp., Inc.,* 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)). To the extent that Market Choice alleges loss of Sub-Broker services for future contracts and "lack of interest" by retailers for other "non-competing product lines," these claims also fail. Market Choice's Amended Complaint fails to allege any facts showing that a contract would have ensued but for the actions of NEC. In an effort to reinforce its claim, Market Choice argues in its brief that it had contractual relationships with some of the Sub-Brokers preceding its representation of NEC. (Pl.'s Br. at 15.) However, this argument is not supported by the Amended Complaint, which fails to allege pre-existing relationships with any of the individual Sub-Brokers. In order to survive a motion to dismiss under Rule 12(b)(6), the complaint must contain allegations providing "enough facts to state a claim to

relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Here, the Amended Complaint does not indicate the identity of the Sub-Brokers or retailers contacted by NEC, the names of the other products involved, or facts to show that a contract was imminent absent the actions of NEC.

### E.      Conversion

A claim for conversion under North Carolina law requires an allegation of "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000) (*quoting Spinks v. Taylor and Richardson v. Taylor Co.*, 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981)).  Thus, conversion is limited to claims involving goods and personal property and does not include "interests such as business opportunities and expectancy interests." *Id.*; *see also Edmondson v. American Motorcycle Ass'n, Inc.*, 7 Fed. Appx. 136, 148 (4th Cir. 2001) ("intangible business assets such as business expectancies and good will may not be the proper subject of a claim for conversion under North Carolina's common law").

Market Choice argues that it has an identified right in the "Sub-Broker network" that it created through its contracts with various Sub-Brokers. However, contract interests do not fall within the range of property interests which can be subject to a claim of conversion.  Market Choice seeks to equate the "Sub-Broker network" to a tangible business asset, such as a mailing list. *See Edmondson*, 7 Fed. Appx. at 147 (holding that the conversion of a mailing list was distinct from a contract dispute). This argument fails because the entire basis of the "network" was the independent contracts with each Sub-Broker. Having continued contractual relationships with the Sub-Brokers

was a mere "business expectancy" and not a property interest which could be converted. Market Choice also alleges that NEC converted its business assets through "unauthorized assertion of control over Market Choice's developed sales schemes, strategies, formulas, and contact lists." (Am. Compl. ¶ 101.) However, this allegation barely rises above the level of a mere recitation of the elements and is not supported by any additional facts to show a plausible claim for relief. *See Iqbal*, 129 S.Ct. at 1949 (noting that "a complaint [does not] suffice if it tenders naked assertion[s] devoid of further factual enhancement"); *Twombly*, 550 U.S. at 570.

### F.      Unfair or Deceptive Trade Practices

To state a claim for unfair or deceptive trade practices (UDTP) under N.C. Gen. Stat. § 75-1.1, a plaintiff must allege three elements: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant." *Nucor Corp. v. Prudential Equity Group, LLC*, 189 N.C. App. 731, 738, 659 S.E.2d 483, 488 (2008). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). A particular act is "in or affecting commerce" if it fits within the inclusive statutory definition of "commerce" as "business activity, however denominated," with particular exceptions for professional services, most employer-employee disputes, and securities transactions. *Id.* at 656-57, 548 S.E.2d at 711; *see also Ellis v. Northern Star Co.*, 326 N.C. 219, 225, 388 S.E.2d 127, 131 (1990) (noting that N.C. Gen. Stat. § 75-1.1 was not intended by the legislature to extend to "certain transactions already subject to pervasive and intricate statutory regulation, such as securities transactions").

Market Choice alleges numerous bases for its claim under § 75-1.1, including:

(a) NEC's unethical attempts to curtail Market Choice's commission earnings, (b) NEC's willful and malicious interference with Market Choice's business relationships; (c) NEC's unethical conversion of Market Choice's Sub-Broker sales team; (d) NEC's making slanderous, libelous, derogatory statements to Market Choice's retailers, Sub-Brokers, and others in the retail food industry; (e) NEC's willful and malicious acts of bad faith, including its withholding of information from Market Choice in breach of the parties' Contract, and unethical disclosure of Market Choice's confidential information, and (f) engaged in violations of the Robinson-Patman Act which adversely affected Market Choice sales to retailers.

(Am. Compl. ¶ 132.) Market Choice cannot rely solely on these general allegations and must provide some factual support to state a plausible claim and provide the notice required under Rule 8(a). *See Twombly*, 550 U.S. at 562, 570; *Iqbal*, 129 S.Ct. at 1950. Thus, the Court must refer to allegations incorporated from all of Market Choice's previous claims.

First, Market Choice points to NEC's "unethical attempts to curtail [its] commission earnings," in reference to its claim under the Sales Representative Commission Act. (Am. Compl. ¶ 132.) This Act merely provides a statutory basis for what is essentially a breach of contract claim and additional remedies to the ones available at common law. "However, it is well recognized that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Nucor Corp.*, 189 N.C. App. at 739, 659 S.E.2d at 488 (*quoting Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 367-68, 533 S.E.2d 827, 832-33 (2000)). In order to recover on UDTP for a breach of contract, "a plaintiff must show substantial aggravating circumstances attending the breach." *Id.* Here, Market Choice has failed to allege any aggravating circumstances to raise NEC's alleged breach of contract with respect to non-payment of commissions to the level necessary to sustain a claim for UDTP. This same infirmity

applies to the extent that Market Choice points to NEC's "bad faith…withholding of information…in breach of the parties' Contract" to support its UDTP claim, (Am. Compl. ¶132), in reference to NEC's alleged withholding of information regarding commissions owed under the Contract which Market Choice raises in its Accounting claim. (*Id.* at ¶ 122). Essentially, these allegations relate to NEC's performance of its obligations under the Contract and thus, are insufficient to state a claim for UDTP absent aggravating circumstances.

Second, Market Choice points to NEC's "malicious interference with Market Choice's business relationships" and "unethical conversion of Market Choice's Sub-Broker sales team," (*Id.* at ¶ 132), but has failed to allege valid claims for conversion or tortious interference with contract and prospective economic advantage. Thus, these claims cannot provide a basis for the UDTP claim. Third, the reference to "unethical disclosure of Market Choice's confidential information," (*Id.*), is not supported by any other factual allegations. A review of the Amended Complaint reveals no other allegation which could be reasonably construed to involve disclosure of confidential information. Thus, this vague allegation alone does not state a plausible claim for UDTP without some factual support.

Fourth, Market Choice seeks to rest its UDTP claim on its allegations of defamation. Defamation *per se* impeaching a party in its business activities may constitute an unfair or deceptive act in or affecting commerce under § 75-1.1. *Ellis v. Northern Star Co.*, 326 N.C. 219, 225, 388 S.E.2d 127, 131 (1990) (holding that libel *per se* constituted an unfair or deceptive act); *Ausley v. Bishop*, 133 N.C. App. 210, 216, 515 S.E.2d 72, 77 (1999) (extending the rule to slander *per se*). Although Market Choice, at this time, has only provided sufficient allegations to state a claim for libel or slander *per quod*, the nature of the alleged defamation relates to the business reputation of

Market Choice. "To recover, however, a plaintiff must have suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." *Ellis*, 326 N.C. at 226, 388 S.E.2d at 131. Market Choice alleged broadly that NEC's unfair or deceptive actions have "caused injury to Market Choice and, in effect, stripped Market Choice's founder and owner of his livelihood." (Am. Compl. ¶ 136.) More specifically, under its defamation claim, which is incorporated by reference to the UDTP claim, (Am. Compl. ¶ 129), Market Choice alleges that the defamatory statements have "diminished its ability to retain and generate new clients," (Am. Compl. ¶ 83). With this more specific allegation of injury which reasonably could have resulted from NEC's actions, Market Choice states a plausible UDTP claim.

Finally, Market Choice alleges that NEC's "violations of the Robinson-Patman Act…adversely affected Market Choice sales to retailers." (Am. Compl. ¶ 132.) This Court understands Market Choice's claim to be that NEC's use of discriminatory pricing schemes with retailers constitutes an UDTP, which negatively affected Market Choice's efforts to maximize sales to all of its represented retailers. Although a violation of the Robinson-Patman Act (RPA) may support a valid claim for UDTP, such a claim would generally coincide with a valid claim under the RPA by an aggrieved purchaser. *See Irwin Indus. Tool Co v. Worthington Cylinders Wisconsin, LLC*, 2009 WL 606218, *12 (W.D.N.C., March 9, 2009). Here, Market Choice, as a non-purchaser, seeks to rest its UDTP claim on the conclusory assertion that NEC violated the RPA and the limited explanation that NEC "[sold] its products to numerous retail accounts at different list prices and [offered] certain select retailers a 2% discount, when similar retail outlets of the same size were not offered such sales terms on a proportionately equal basis." (Am. Compl. ¶ 47.)

However, this Court need not determine whether Market Choice, as a non-purchaser, may

assert a violation of the RPA as a basis for a UDTP claim, because Market Choice has failed to sufficiently allege the elements of a RPA violation. To state a valid claim under the RPA, a plaintiff must show:

> (1) that the relevant sales were made in interstate commerce; (2) that the goods sold were of "like grade and quality"; (3) that the seller discriminated in price between the plaintiff and another purchaser; and (4) that " 'the effect of such discrimination [was] to injure, destroy, or prevent competition' to the advantage of a favored purchaser, *i.e.*, one who 'receive[d] the benefit of such discrimination.' "

*Irwin Indus. Tool*, 2009 WL 606218, *9 (*citing Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006) (*quoting* 15 U.S.C. § 13(a))). Market Choice fails to allege facts to support the requisite elements for a plausible claim under the RPA. The Amended Complaint lacks any factual allegations identifying the particular goods involved, the retailers affected, the actual injury to affected retailers, or the circumstances of the sales transactions involved. Absent a plausible claim for violations of the RPA, Market Choice cannot rely on this as a basis for its UDTP claim.

## G.     Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege: (1) a benefit conferred to the other party, (2) not required by a contract either express or implied or a legal duty, (3) not conferred gratuitously or in an officious manner, i.e. not by an unjustified interference in the affairs of the other party, (4) which is measurable, and (5) consciously accepted by the other party. *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "If there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Id.* However, the contract only governs if it refers to the same subject matter as the alleged implied contract. *See Root v. Allstate Ins. Co.*, 272 N.C. 580, 583, 158 S.E.2d 829, 832 (1968).

Market Choice alleges that NEC retained the benefit of the Sub-Broker network without tendering fair compensation for its development, and that the development of this network was beyond the scope of the Contract. (Am. Compl. ¶¶ 112 – 15.) However, the development of a Sub-Broker network was plainly contemplated in the parties' agreement, and compensation for this activity is specifically addressed by the terms of the Contract. (Am. Compl. Ex. A at 2, ¶ 7.) The Contract states: "MASTER BROKER shall contract/employ independent market brokers in furtherance of sales of PRINCIPAL'S Products. Master broker will negotiate rate of commission for independent market brokers out of MASTER BROKER'S commission agreement with PRINCIPAL." (*Id.*) Additionally, Market Choice alleges that, although other brokerage companies required "a significant retainer," Market Choice negotiated a "one-year payout commission" to compensate for its "pioneering" efforts. (Am. Compl. ¶ 15.) Thus, the Contract specifically provided for compensation in the form of a regular commission for each sale, including sales made by Sub-Brokers, and an additional one-time payment at termination for Market Choice's efforts to develop the Sub-Broker network. This Court will not impose an implied contract for the same subject matter addressed by the parties' express contract.

### H.    Accounting

The remedy of an equitable accounting may be available when a plaintiff has asserted a valid claim for relief in equity and an accounting is necessary to compel discovery of information regarding accounts held exclusively by the defendant. *See Dunn v. Johnson*, 115 N.C. 249, 20 S.E.2d 390, 390-91 (1894); *Toomer v. Branch Banking and Trust Co.*, 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005); *see also* 3 Am. Jur. *Agency* 2d § 241 ("An agent may also be entitled to an

accounting where it is necessary to establish his or her compensation, such as where it is to be measured by profits or commissions"). However, "[t]he hallmark rule of equity is that it will not apply 'in any case where the party seeking it has a full and complete remedy at law.' " *Hinson v. United Fin. Servs., Inc.*, 123 N.C. App. 469, 473, 473 S.E.2d 382, 385 (N.C. Ct. App. 1996) (*quoting Jefferson Standard Life Ins. Co. v. Guilford County*, 225 N.C. 293, 300, 34 S.E.2d 430, 434 (N.C.1945)). Although this Court may grant either legal or equitable relief, a plaintiff must allege and establish facts to warrant an equitable remedy. *Wilmar, Inc. v. Liles*, 13 N.C. App. 71, 74, 185 S.E.2d 278, 280 (1971).

First, Market Choice has failed to state a claim for unjust enrichment to support its accounting demand. Furthermore, Market Choice essentially asserts that an accounting is necessary to determine any additional commissions due under the Contract, (Am. Compl. ¶¶ 120 - 24), and to determine the "adverse affect on sales" of any violations by NEC of the Robinson-Patman Act, (Am. Compl. ¶ 125). However, Market Choice has an adequate remedy under the Federal Rules of Civil Procedure for discovery of information relevant to its breach of contract claim and fails to allege any reason why the available discovery scheme would be insufficient. *See* 1A C.J.S. *Accounting* §26 (2009) (noting that the discovery function of the equitable accounting remedy "has often been superseded by modern discovery rules, and one is not entitled to an accounting, if that party can procure the needed information through the use of standard discovery procedures"); 12 C.J.S. *Brokers* § 287 (2009) ("A suit in equity to recover commissions will not lie where the remedy at law is adequate").

### III.    CONCLUSION

Taking the facts in the light most favorable to the plaintiff and making all reasonable inferences in the plaintiff's favor, this Court finds that Market Choice alleged sufficient facts to maintain the following claims for relief: (1) N.C. Sales Representative Commissions Act, N.C. Gen. Stat. § 66-191, to the extent such claims relate to regular sales commissions under paragraph 10 of the parties contract; (2) defamation; and (3) N.C. UDTP Act, N.C. Gen. Stat. § 75-1.1, to the extent such claims are based on NEC's alleged defamation of Market Choice.  However, this Court finds that Market Choice fails to state a plausible claim for relief on the following claims: (1) N.C. Sales Representative Commissions Act with respect to the "one-time payout commission"; (2) tortious interference with contract and business relationships; (3) conversion; (4) unjust enrichment; and (5) accounting.

**IT IS THEREFORE ORDERED**, that NEC's "Motion to Dismiss" NEC's claims for the "one-time payout commission" under N.C. Gen. Stat. § 66-191, tortious interference with contract and business relationships, conversion, unjust enrichment, and accounting is **GRANTED**.

**IT IS FURTHER ORDERED**, that NEC's "Motion to Dismiss" Market Choice's claims for regular sales commissions under N.C. Gen. Stat. § 66-191, defamation, and UDTP under N.C. Gen. Stat. § 75-1.1 is **DENIED**.

Signed: August 17, 2009

Richard L. Voorhees
United States District Judge

23